IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WALLICE F. JACKSON, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LEHIGH VALLEY PHYSICIANS | : | |
| GROUP, | : | |
| Defendant. | : | NO. 08-3043 |

## MEMORANDUM

GENE E.K. PRATTER, J.                                                    APRIL 20, 2010

Wallice Jackson claims that her former employer, Defendant Lehigh Valley Physicians

Group, engaged in race discrimination/disparate treatment of her and retaliation in violation of

Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act.  Ms.

Jackson also brings a claim for intentional infliction of emotional distress.  Lehigh Valley

Physicians Group moves for summary judgment on all claims.  For the reasons that follow, the

Court denies summary judgment on Ms. Jackson's race discrimination and retaliation claims,

and grants summary judgment as to Ms. Jackson's emotional distress claim.

## I.        PROCEDURAL HISTORY

On July 1, 2008, Ms. Jackson filed a complaint against her former employer, "Lehigh

Valley Physicians Group, affiliated with Lehigh Valley Health Network" ("Physicians Group"

and "Network," respectively).[1]  Two days later, Ms. Jackson filed an Amended Complaint

---

[1]  Physicians Group asserts that it was Ms. Jackson's employer.  See Def.'s Statement of Facts at
¶ 6.  Ms. Jackson agrees that Physicians Group was her "locale of employment within the Lehigh
Valley Health Network," but disagrees with any inference that Network is not a party to this
action because Ms. Jackson's notice of hire, job description, performance assessments, (cont...)

against Physicians Group. Physicians Group then filed a partial motion to dismiss on August 21, 2008, which the Court granted in part and denied in part. Specifically, the Court granted Physicians Group's motion as to Ms. Jackson's Pennsylvania Whistleblower Law claim, and denied the motion as to her intentional infliction of emotional distress ("IIED") claim. The parties then engaged in discovery regarding the remaining claims, namely, race discrimination/disparate treatment and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), and IIED. Discovery concluded, and Physicians Group filed a motion for summary judgment, which has been fully briefed.

## II.    STATEMENT OF FACTS

A number of the events at issue in this case occurred over long periods of time, and substantially overlap with other events. Thus, it is challenging to construct a chronological Statement of Facts that fairly presents the parties' evidence and positions in context. Accordingly, the Court first sets forth, in chronological order, the facts regarding Ms. Jackson's complaints, discipline, termination and the aftermath. Then, the Court sets forth the facts regarding some additional events upon which Ms. Jackson relies to support her claims.

### A.    *People Involved in the Case*

On September 19, 2005, Ms. Jackson was hired at Physicians Group as a medical assistant in the Gynecology/Oncology Department ("Department"). Def's Ex. B, Employment

---

(cont...)  personnel reports, pay checks, and subsequent HR form letters all reference Network and not Physicians Group.  See Pl.'s Statement of Facts at ¶ 6.  The differences between the parties' characterizations of the company's employment structure do not have any significance for this case, as neither Ms. Jackson nor Physicians Group (the two parties formally of record) have asserted that Physicians Group is an improper party to this case, or that Network should be joined or substituted as a party.

Offer Letter.  During the time she worked at Physicians Group, Ms. Jackson was the Department's sole African-American employee.  Def's Ex. A, Deposition of Wallice Jackson ("Jackson Dep.") at 306; Def's Ex. E, Wallice Jackson Interrogatory, No. 3.  In addition to Ms. Jackson, the Department employed two other medical assistants during the time period in question:  Patricia McElroy and Maria Olivera.  Def.'s Ex. A, Jackson Dep. at 170-71, 191-92, 300.

Sandra Tkach, R.N., the Department's Practice Manager, was the Physicians Group medical assistants' immediate supervisor.  Def.'s Ex. A, Jackson Dep. at 156; Def.'s Ex. R, Physicians Group Interrogatory, No. 2.  Richard Boulay, M.D., the Department's Practice Leader, had ultimate responsibility for all clinical services provided in the Department.  Def.'s Ex. D, Boulay Interrogatory, No. 1.  Dr. Boulay and Ms. Tkach shared responsibility for all administrative matters in the Department.  Id.

Alyssa Pauls, R.N., was a nurse in the Department who worked with Dr. Waleed Shalaby.  Def.'s Ex. A, Jackson Dep. at 257.  Chuck Eggen was the Human Resources Manager at Physicians Group, and Pamela Repetz was the Oncology Division Director.  Def.'s Ex. H, Tkach Interrogatory, No. 1.

B.    *Mentoring of Ms. Olivera; Observations and Reports about her Competency*

In May 2006, Ms. Olivera began working in the Department as a Medical Assistant.  Def's Ex. A, Jackson Dep. at 171.  Ms. Olivera was initially mentored by Ms. McElroy; however, after less than a week, Ms. McElroy went on maternity leave and Ms. Jackson was asked to mentor Ms. Olivera.  Id at 171, 196.  While mentoring Ms. Olivera, Ms. Jackson observed that Ms. Olivera did not know how to take a proper blood pressure reading and had

recorded false information into a patient's medical chart.  Id. at 171.  In addition, Ms. Olivera admitted to Ms. Jackson that she did not know the difference between a diastolic and a systolic pressure.  Id. at 172.  Ms. Jackson reported these findings directly to Dr. Boulay.  Id.  In response, Dr. Boulay said that he would so advise Ms. Tkach, and he further assigned Ms. Jackson to do all blood pressure readings.  Id.  The next morning, Ms. Tkach called Ms. Jackson into her office regarding Ms. Jackson's observations of, and interactions with, Ms. Olivera.  Id.  When Ms. Jackson requested information about how she could assist in the resolution of these issues, Ms. Tkach told Ms. Jackson that it was none of her business and that she (Ms. Tkach) would handle the situation.  Pl.'s Ex. 2, Jackson Dep. at 195.  From that day forward, Ms. Jackson was no longer assigned to mentor Ms. Olivera.  Def.'s Ex. A, Jackson Dep. at 192.

Although she formally mentored Ms. Olivera for only one day, Ms. Jackson instructed her on proper data collection techniques on more than one occasion.  Pl.'s Ex. 2, Jackson Dep. at 202.  Ms. Jackson testified that Ms. Olivera consistently refused instruction and, in one instance, refused to acknowledge a verbal assignment request from Ms. Jackson, as required by the medical assistant job description.  Id. at 197-98; Pl.'s Ex. 1, Physicians Group Medical Assistant Job Description, 5.1-5.3. [2]

---

[2] Ms. Jackson asserts that Ms. Olivera's conduct, combined with Ms. Tkach's repeated reprimands and write-ups, led Ms. Jackson to believe that she was being retaliated against for questioning Ms. Olivera's clinical competence and impact on patient safety, and for reporting her concerns to the very person (Ms. Tkach) who had hired Ms. Olivera.  Def.'s Ex. 2, Jackson Dep. at 171-72, 306.

Retaliation for reports about clinical incompetence may be pertinent to a Whistleblower Law claim, but no party has argued seriously that such reports are pertinent to Ms. Jackson's Title VII, PHRA, or IIED claims.  Ms. Jackson's Whistleblower Law claim was previously dismissed by the Court.

C.      *March 1, 2006, Meeting and March 20, 2006, Personnel Report*

On March 1, 2006, Ms. Tkach and Dr. Boulay met and discussed supposedly unprofessional behavior that Ms. Jackson had reportedly exhibited towards an unnamed "float" employee in the Department on February 22, 2006.  Def.'s Ex. 2, Jackson Dep. at 164.  This meeting was later documented in a "Confirmation of Counseling" Personnel Report, which was dated March 20, 2006.  Def.'s Ex. F, Mar. 2006 Personnel Report.[3]

D.      *Ms. McElroy's Return to Work and her "Rebuffs" of Ms. Olivera*

Ms. McElroy returned to work from maternity leave on July 26, 2006.  Def.'s Ex. I, Deposition of Patricia McElroy ("McElroy Dep.") at 47.  On two separate occasions after Ms. McElroy's return, Ms. Olivera was "rebuffed" by Ms. McElroy for seeking a second opinion on issues for which Ms. Jackson had already provided instructions.  Pl.'s Ex. 10, McElroy Dep. at 98-100.  For example, on one occasion, Ms. McElroy stated "There's no need for you to ask me. I said [that Ms. Jackson] has already expressed to you what you're supposed to do and that's your answer."  Id. at 98.  Ms. Jackson then followed up by telling Ms. Olivera "I just told you and I answered you.  There was no reason that you need[ed] to ask [Ms. McElroy]."  Id. at 99.

E.      *August 1, 2006, Complaints about Ms. Jackson and Related Meetings*

On August 1, 2006, three Department staff members complained to Ms. Tkach that Ms. Olivera was upset and crying, reportedly after having unpleasant interactions with Ms. Jackson and Ms. McElroy.[4]  Def.'s Ex. G, Tkach's Notes.  Shortly therafter, Ms. Tkach met with Ms.

---

[3]  The Court notes that March 20, 2006, was only one business day after Ms. Jackson filed an Employee Incident Report about her alleged assault by Ms. McElroy, an issue that will be discussed later in this memorandum.

[4]  Ms. Jackson disagrees with any inference that these three staff members actually witnessed the interactions that supposedly formed the basis for Ms. Olivera's allegations.  Pl.'s Opp. (cont...)

Olivera. Def.'s Ex. H, Tkach Interrogatory, No. 1. According to Ms. Tkach's notes from the meeting, Ms. Olivera "felt she was being treated unkindly" by both Ms. Jackson and Ms. McElroy. Def.'s Ex. G, Tkach's Notes.

Ms. Tkach's notes reflect that she subsequently met with Ms. McElroy and that Ms. McElroy told her she "felt that Wallice Jackson was verbally unkind to Maria Olivera." Id. In her deposition, Ms. McElroy testified that she told Ms. Tkach that there was tension between Ms. Jackson and Ms. Olivera, on account of "[Ms. Olivera] not listening to Ms. Jackson." Pl.'s Ex. 10, McElroy Dep. at 101-02. However, in contrast to Ms. Tkach's meeting notes, Ms. McElroy specifically denied telling Ms. Tkach that Ms. Jackson had ever been "verbally unkind" to Ms. Olivera, or that the tension between the two women was due to Ms. Jackson. Id. at 101.

On August 3, 2006, Ms. Tkach met with Ms. McElroy, Ms. Jackson and Ms. Olivera, and informed them that she would not tolerate unkind, disrespectful behavior at work. Def.'s Ex. G, Tkach's Notes. On August 16, 2006, Ms. Tkach again counseled Ms. Jackson and Ms. McElroy about their alleged disrespectful behavior toward fellow employees. Id.

F.    *August 16, 2006, Personnel Report and Related Meetings*

On August 16, 2006, a "Confirmation of Counseling" Personnel Report was issued to Ms. Jackson regarding her allegedly unkind treatment of Ms. Olivera. Def.'s Ex. J, Aug. 2006 Personnel Report. Ms. Jackson refused to sign this Personnel Report. Id. On August 18, Ms. Jackson asked Ms. Tkach to remove the Personnel Report from her personnel file, which Ms.

---

(cont...) to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at ¶ 21. Ms. Jackson also disagrees with any inference that the three staff members directly corroborated, or that Ms. Tkach otherwise confirmed, Ms. Olivera's allegations. Id. at ¶ 22.

Tkach agreed to do.  Def.'s Ex. G, Tkach's Notes.  Ms. Tkach also told Ms. Jackson that she must follow acceptable behavior standards in the future.  Id.

On August 24, 2006, Ms. Tkach met with Ms. Jackson and Ms. McElroy and reviewed her expectations that all employees treat one another with kindness and respect.  Id.

G.    *The Jackson 2006 Employee Performance Assessment*

Roughly two weeks later, Ms. Jackson received and signed an Employee Performance Assessment for the 2006 fiscal year ("Jackson 2006 EPA"), which year started on July 1, 2005, and ended on June 30, 2006.  Def.'s Ex. B., Jackson Dep. at 248-49; Def.'s Ex. K, Jackson 2006 EPA.  The Jackson 2006 EPA states that Ms. Jackson "[d]oes not consistently demonstrate professionalism or respect with co-workers."  Def.'s Ex. K, Jackson 2006 EPA at 1.  In the Jackson 2006 EPA, under the heading "Opportunities for Improvement," there is a passage about how Ms. Jackson needs to (1) demonstrate "respectful behaviors to fellow co-workers, physicians, and practice manager" and (2) "maintain a positive attitude when dealing with patients, co-workers, other departments, and physicians as per the new [Physicians Group] service standards."  Id. at 4.  In another section, the Jackson 2006 EPA states that Ms. Jackson needs to demonstrate respectful behavior to her fellow co-workers, physicians, other departments, and the practice manager.  Id.  The Jackson 2006 EPA further states that Ms. Tkach, the practice manager, will observe and monitor Ms. Jackson's behavior toward her co-workers, physicians, and other departments, and Dr. Boulay, the practice leader, will report his observations of Ms. Jackson's "respect for team members and leader."  Id.

Ms. Jackson asserts that the foregoing assessment arises from allegations of which Ms. Tkach admits to being without knowledge as to exact dates, words and/or conduct.  She further

points out that her "press ganey" score, which measures patient satisfaction with customer service and professional skills, was rated at 95.1%-96.8%. <u>Id</u>. at 2; Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at 36;   Ms. Jackson also highlights that her 2006 EPA lists "strong emotional maturity" and "strong customer service skills" among her "strengths." <u>Id</u>. at 4.

Ms. Jackson never registered a complaint with Physicians Group about her 2006 EPA. Def.'s Ex. A, Jackson Dep. at 256.  She explains that she did not feel there was a need for formal action at that point, because she did not know "exactly why these things came about," but she thought the issues could be resolved if she went back to her "regular duties." <u>Id</u>. at 257.

### H.     Nurse Pauls' Handwritten Note

Ms. Alyssa Pauls, a nurse who works with Dr. Waleed Shalaby in the Department, gave Ms. Tkach a handwritten note on September 13, 2006.  Def.'s Ex. H, Tkach Interrogatory, No. 1; Def.'s Ex. L, Pauls Note; Def.'s Ex. Y, Declaration of Sandra Tkach ("Tkach Dec.") at ¶ 7. This note states that on September 13, 2006, Ms. Olivera approached Ms. Pauls appearing "noticeably upset." Def.'s Ex. L, Pauls Note.  When Ms. Pauls asked Ms. Olivera how she was doing, Ms. Olivera began to cry and stated that Ms. Jackson and Ms. McElroy were not treating her appropriately at work, and this was beginning to affect her physically and emotionally. <u>Id</u>. According to Ms. Pauls' note, Ms. Olivera said that she did not notice any improvement in how Ms. Jackson and Ms. McElroy treated her at work. <u>Id</u>.  The note further states that, according to Ms. Olivera, Ms. Jackson and Ms. McElroy "delegate much of the office tasks to her (without their help) while they are often doing non-work related things." <u>Id</u>. [5]

_____

[5]  Ms. Jackson disagrees with any inference that Ms. Pauls *witnessed* the disrespectful conduct alleged by Ms. Olivera.  Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement  (cont...)

Ms. Jackson disagrees that she delegated office tasks to Ms. Olivera. Indeed, Ms. Jackson testified that during the summer of 2006, she did all of the blood draws, all of the sterilizations and all of the blood pressures in the Department, because Ms. McElroy was out on maternity leave, and Ms. Olivera's clinical competencies were not reassessed until August 22, 2006, at which time it was determined that Ms. Olivera's paracentesis (sterilization) competancy remained an "issue." Pl.'s Ex. 2, Jackson Dep. at 388; Pl.'s Ex. 12, Tkach Notes from Aug. 22 2006. Ms. Jackson also asserts that Ms. Olivera's complaints arise from Ms. Jackson accusing Ms. Olivera of not taking "accurate blood pressure or pulse readings, and/or preparing charts in a proper manner or at an acceptable pace." Pl.'s Ex. 15, Olivera Interrogatory, No. 1. Ms. Jackson does not agree that she was delegating work to Ms. Olivera; rather, she asserts that she was picking up Ms. Olivera's "slack." Pl.'s Statement of Facts at ¶ 43.

I.      *Dr. Shalaby's Note*

Dr. Shalaby wrote a September 14, 2006, letter in which he stated that he had

> observed or been made aware of unprofessional behavior from our medical assistances [sic] (Patty and Wally) compromises [sic] care delivery. The hiring of Mariah [sic] Olivera has allowed my office practice to run with great ease. On two occasions, Mariah [sic] has been found in tears over the comments and attitudes displayed by Patty and Wally. Mariah has gone to great lengths to avoid discussing the issues with me; however, it is hard to avoid seeing a member of your team upset during offices [sic] hours. . . I am upset that a member of my care team has to tolerate the rude and unprofessional behavior of the [sic] Patty and Wally. I am fairly certain that Mariah [sic] will start looking for another job since this behavior has continued despite warnings.

Def.'s Ex. M, Dr. Shalaby Letter. Dr. Shalaby gave this letter to Ms. Tkach on the day it was written, September 14, 2006. Def.'s Ex. Y, Tkach Dec. at ¶ 9. On or about this date, Ms. Tkach met with Nurse Pauls and Dr. Shalaby to discuss their observations and criticisms of Ms.

---

(cont...) of Facts at ¶ 43.

Jackson's and Ms. McElroy's allegedly demeaning and disrespectful treatment of Ms. Olivera. Id. at ¶ 11. Ms. Tkach also spoke with Ms. Olivera about these issues. Id.

According to Ms. Tkach, when she met with Ms. Olivera, Ms. Olivera started to cry and gave Ms. Tkach "specific examples of unkind treatment towards her by both [Ms. Jackson and Ms. McElroy]." Def.'s Ex. Y, Tkach Dec. at ¶ 11; see also Pl.'s Ex. 19, Tkach Notes from Sep. 19 2006. According to Ms. Tkach's notes from the meeting, these "specific examples" included an instance on September 11 when Ms. Olivera offered to help clean a room with Ms. Jackson and Ms. Jackson loudly told her to "[c]lean [her] own rooms"; an instance on September 13 when Ms. McElroy told Ms. Olivera, "[y]ou are not doing enough charts"; and an instance when Ms. Olivera witnessed Ms McElroy "verbally being loud" to a fellow nurse. Pl.'s Ex. 19, Tkach Notes from Sep. 19 2006. Ms. Tkach's notes also reflect that, according to Ms. Olivera, "the behavior is usually not witnessed by fellow co [sic] workers." Id. The notes further state that "[Ms. Olivera] was instructed this behavior is not acceptable nor would it be tolerated and she needs to notify myself or in my absence, Dr. Richard Boulay or Tracy DeLong, clinical coordinator immediately upon any more behavior. Chuck Eggen from Human Resources contacted regarding problem." Id.

Ms. Jackson does not challenge the authenticity of Dr. Shalaby's note, but she asserts that "Dr. Shalaby's letter is not clear as to what he may or may not have observed other than encountering a tearful [Ms. Olivera] with allegations about being mistreated by [Ms. Jackson] and Ms. McElroy." Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at 12, ¶ 46. [6]

---

[6] Ms. Jackson states that she "does not agree with entrance of consideration of any testimony by, from or on behalf of Dr. Shalaby on this matter since he is no longer employed by  (cont...)

*J.*     *Dr. Boulay's Note*

Five days later, Dr. Boulay gave Ms. Tkach a handwritten note in which he described a

conversation that took place between himself and Ms. Olivera on September 12, 2006. Def.'s

Ex. O, Dr. Boulay Note. Dr. Boulay wrote that he had a discussion with Ms. Olivera "regarding

her perception of interactions between herself and Wally Jackson and Patty McElroy." Id. Dr.

Boulay's note states that "Maria [Olivera] described their behavior as 'mean'" and that he and

Ms. Olivera "explored together some behaviors that were occurring." Id. Dr. Boulay continued,

> Maria denied that any physical or verbal threats or cussing was directed at her. The
> behaviors she found distressing were those of intimidation, [and] bullying which she
> feels stems from jealousy of the ease at which she picked up her jobs' [sic] tasks. She
> also feels there has been talking behind her back. These behaviors have led to a digestive
> disorder, for which she has missed work at least once and is considering [illegible]
> employment. [7]

*K.*     *September 25, 2006 Meetings and Documentation*

Ms. Tkach met with Ms. Jackson on September 25, 2006. Def.'s Ex. Y, Tkach Dec. at ¶

15. That same day, Ms. Tkach drafted a Personnel Report regarding this meeting. Def.'s Ex. P,

Sep. 2006 Personnel Report. Ms. Tkach reported that "several staff members including

physicians" had made her aware of "[Ms. Jackson's] unprofessional, disrespectful, demeaning

---

(cont...) Defendants, has moved out of the geographical region and is otherwise unavailable."
Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at 12, ¶ 46; see Pl.'s Ex.
17, Shalaby Interrogatory No. 3. The Court's decision is not altered by the consideration of any
evidence provided by Dr. Shalaby, one way or another. The parties may file a formal motion
and brief this issue at trial, if they wish and, of course, if appropriate.

[7] Ms. Jackson disagrees with and objects to any inference that Dr. Boulay's statement suggests
that Ms. Olivera's digestive disorder actually was *caused* by being mistreated by Ms. Jackson
and Ms. McElroy. Ms. Jackson points out Dr. Boulay's references to Ms. Olivera's feelings that
"there has been talking behind her back" and to allegations of "jealousy." Pl.'s Opp. to Def.'s
Mot. for Summ. J. and Resp. to Statement of Facts at ¶ 53.

behavior towards fellow employees. This behavior has been discussed previously on 8/1/06 and at the time the decision was made not to pursue documentation into personnel file. Behavior also discussed at evaluation and goals set and agreed to."[8] Id. In the "action taken" section of the Personnel Report, Ms. Tkach wrote, "[a]ny further display of unprofessional behavior will result in further disciplinary action [and/or] termination." Id. At the bottom of the Personnel Report, on the line designated for the employee's signature, are the words "refused to sign." Id.

Following this meeting with Ms. Jackson, Ms. Tkach met with Chuck Eggen, Human Resources Manager, and Pamela Repetz, Oncology Division Director, to discuss staff conflict issues involving Ms. Jackson. Def.'s Ex. H, Tkach Interrogatory No. 1.

Later that same day, Ms. Tkach again met with Ms. Jackson to discuss the alleged "unprofessional, disrespectful and demeaning behavior," and Ms. Jackson was given a formal reprimand accusing her of unprofessional, disrespectful behavior toward fellow employees. Def.'s Ex. Y, Tkach Dec. at ¶¶ 14-15; Def.'s Ex. P, Sep. 2006 Personnel Report. As before, Ms. Jackson asserts, she was not provided with any details of the alleged incidents, except that she was given the dates on which they allegedly occurred. Pl.'s Ex. 2, Jackson Dep. at 273, 398. On one of these dates, Ms. Jackson states that she was on outside of the state. Id. at 273.

Ms. Jackson refused to sign the formal reprimand that Ms. Tkach gave her. Id. She refused because, when she asked Ms. Tkach to explain the behavior of which she was accused

---

[8] Ms. Jackson asserts that at this September 25, 2006 meeting, Ms. Tkach refused to explain exactly what the "several staff members" had accused Ms. Jackson of doing. Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at ¶ 55.

and its relation to the "event" that took place while she was on vacation outside the state, Ms. Tkach told her it was none of her business.[9] Id. at 398.

During this second meeting with Ms. Tkach on September 25, Ms. Jackson again denied engaging in inappropriate, unprofessional, disrespectful or demeaning behavior toward Ms. Olivera. Def.'s Ex. Y, Tkach Dec. at ¶ 17. Instead, Ms. Jackson complained of "harassment" and stated that the "write-ups and allegations were bias." Pl.'s Ex. 2, Jackson Dep. at 396-97. Following the meeting, Ms. Tkach added an addendum to the Personnel Report that she had drafted earlier, in which she stated "Wallice refused to sign, stated she felt this was biased and stated she was resigning." Pl.'s Ex. 8, Addendum to Sep. 2006 Personnel Report.

Shortly thereafter, Ms. Tkach and Dr. Boulay, with input from Human Resources, decided to terminate Ms. Jackson and Ms. McElroy, ostensibly because they were a source of conflict within the Department. Def.'s Ex. Y, Tkach Dec. at ¶ 17. At some point, Ms. Tkach was specifically told by Mr. Eggen that one of the reasons she was being terminated was her so-called assault on Ms. Jackson, discussed infra. Pl.'s Ex. 10, McElroy Dep. at 134-35.

L.    *September 27, 2006 Termination of Ms. Jackson and Ms. McElroy*

On September 27, 2006, Ms. Jackson and Ms. McElroy were terminated. Def.'s Ex. A, Jackson Dep. at 278-79. Ms. Jackson met with Ms. Tkach, Dr. Boulay and Mr. Eggen, and was told that she had the option of accepting a severance package or continuing to work for 30 days

---

[9] Ms. Jackson continues to emphasize that there is no reasonable basis for Ms. Tkach's subjective believe that Ms. Jackson actually engaged in unprofessional, disrespectful and demeaning behavior toward Ms. Olivera, because Ms. Tkach is "without knowledge or information as to exact dates, words and/or conduct alleged against [Ms. Jackson] that formed the basis of each complaint by [Ms. Olivera]." Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at ¶ 60.

while searching for other work within the Network system.  Id.; Def.'s Ex. Y, Tkach Dec. at ¶

18.  Ms. Jackson elected to continue working for 30 days, during which time she sought another

position within the Network system. Def.'s Ex. A, Jackson Dep. at 280-81.

M.    *Equal Employment Opportunity Commission Charge*

Eventually, Ms. Jackson signed and filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC").  Def.'s Ex. S, EEOC Charge.  In the

December 2006 EEOC Charge, Ms. Jackson wrote that Physicians Group terminated her

employment for "allegedly speaking to fellow employees in a 'demeaning and disrespectful'

manner."  Id.  In her related EEOC Discipline Questionnaire, Ms. Jackson wrote that Physicians

Group explained to her that she was being terminated because "[s]everal staff members and

physicians stated that I exhibited demeaning behavior toward my fellow employees."  Def.'s Ex.

T, EEOC Discipline Questionaire at 1 No. 3.  In her related EEOC Witness Questionnaire, Ms.

Jackson identified Ms. McElroy as a witness who could provide information in support of Ms.

Jackson's EEOC Charge.  Def.'s Ex. U, EEOC Witness Questionnaire.  In this context, Ms.

Jackson described Ms. McElroy as follows: "[s]he is one of my ex-co-workers.  She can attest to

my excellent job performance and that I never spoke to fellow co-workers in a demeaning and

disrespectful manner.  She was terminated at the same time that I was for the same reason."  Id.

In addition to disputing certain facts regarding her complaints, discipline, termination and

aftermath, Ms. Jackson also provides evidence of additional events to support her causes of

action, as set forth below.

N.    *Missing Photograph*

In early May of 2006, Department staff group photos were taken for a brochure that was

to be published to introduce new physicians in the Department.  Pl.'s Ex. 2, Jackson Dep. at 209.

The first group photo shoot took place sometime after the day that Ms. Jackson initially

mentored Ms. Olivera and expressed concerns about her professional skills.  Id. at 209.[10]  Ms.

Jackson was included in this photo shoot, and was specifically asked to wear her uniform.  Id. at

209.

     Some time thereafter, there was a second departmental photo shoot, in which Ms.

Jackson also participated.  Id. at 211.  According to Ms. Jackson, this second photo shoot was

taken because some of the employees were missing from the first photo shoot.  Id.  Again, Ms.

Jackson was specifically asked to wear her uniform.  Id.

     At some point afterwards, there was a third departmental photo shoot.  Id. at 211, 369.

This shoot took place without Ms. Jackson's knowledge, and Ms. Jackson was not invited to

participate.  Id. at 211.  The staff brochure, which was released in September or October of 2006,

included a photograph from the third photo shoot.  Id. at 369.  The brochure photo included Ms.

Olivera, but did not include Ms. Jackson, Ms. McElroy, or Carol Klinetob, R.N., another

departmental employee.  Id. at 227-28, 369; see also Def.'s Exhibit V, Brochure Photo.  Ms.

Jackson asserts that the absence of Ms. McElroy and Ms. Klinetob - who are both white - can be

explained because Ms. McElroy was out on maternity leave and could not attend the third photo

shoot, and Ms. Klinetob was going to school at the time of the photo shoot and had been absent

from previous photo shoots as well.  Id.  Ms. Jackson's own absence, however, cannot be so

---

[10]  It is not clear whether Ms. Jackson's mentoring occurred before or after the first Departmental
photo.  In their Statements of Facts, both parties agree that the mentoring occurred after the first
photo was taken.  See Def.'s Statement of Facts at ¶ 80; Pl.'s Statement of Facts at ¶ 80.
However, Ms. Jackson's deposition testimony reflects that the mentoring came before the first
photo was taken.  See Def.'s Ex. A, Jackson Dep. at 210.

explained.

Ms. Jackson was upset that she was not included in the brochure photo. When she asked Ms. Tkach about it, Ms. Tkach told her it was because the photographer had lost the particular photographs that included her. Def.'s Ex. A, Jackson Dep. at 211-12. The record does not contain any additional evidence regarding the truth of this "lost photographs" explanation, one way or another. Even if the photographer in fact lost the photographs containing Ms. Jackson, Physicians Group and Ms. Tkach present no evidence as to why Ms. Jackson was not *invited* to participate in the third photo shoot, other than to note that Ms. Jackson was not in the office on the day of the third photo shoot. Def.'s Ex. Y, Tkach Dec. at No. 3.

O.     *Grievance Hearing Requests and Unemployment Benefits*

Ms. Jackson admits that she did not file a written request for a Physicians Group grievance hearing regarding her termination, points out that she contacted the grievance board by phone on multiple occasions for a hearing. Id. at 283. In fact, Ms. Jackson testified that she was in constant contact with Mary Ann Bulishak, Network Ombudsman, from the date of her termination through the end of her 30-day severance period. Id. at 284. Ms. McElroy was also in constant contact with Ms. Bulishak during this time. Pl.'s Ex. 10, Deposition of Patricia McElroy at 21. Ms. Jackson testified that her request for a grievance hearing was denied in late September 2006, and she was told by Ms. Bulishak that the grievance committee members were "not wasting their time to hear [Ms. Jackson's] side of the story." Pl.'s Ex. 2, Jackson Dep. at 283. By contrast, Ms. Jackson asserts, Physicians Group was much more receptive to Ms. McElroy's request for a grievance hearing; Ms. Bulishak even sent a hand-written memorandum titled "Issue Resolution Process Step Two" to Mr. Eggen, Ms. Tkach, and David Regan, the Vice

President/Associate Executive director of Specialty Practices, regarding Ms. McElroy's desire for a grievance hearing. Pl.'s Ex. 26, Memorandum from Maryann Bulishak.

Appearing to contradict this testimony, Ms. Jackson wrote on her EEOC Discipline Questionnaire that "as of 11/30/06, Mary Anne Bulishak stated that the Respondent [Physicians Group] would be giving me hearing [sic] on December 12, 2006" and that "[s]he also stated that the Respondent was willing to take the write-up out of my file." Def.'s Ex. T, EEOC Discipline Questionnaire. Ms. Jackson addressed the apparent contradiction in her Statement of Facts, noting that she only meant that the December 12, 2006, promise of a grievance hearing was not made to her *directly*, because her then-attorney had advised her not to talk to Lehigh Valley Hospital. Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at ¶ 92.[11]

Ms. Jackson filed for unemployment benefits on or about October 27, 2006, and despite Physicians Group's objection, the Commonwealth of Pennsylvania Department of Labor and Industry ("L&I") found her eligible. L&I stated that Physicians Group had failed to present sufficient evidence that Ms. Jackson's termination was based on a "willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard for the standards of behavior which the employer has the right to expect, or negligence which demonstrates wrongful intent or intentional and substantial disregard of the employer's interest or the employer's duties and obligations." Pl.'s Ex. 27, L&I Notice of Determination.

P.       *"You People" Comment*

On March 13 or 14, 2006, Ms. McElroy was angrily talking to Ms. Jackson about

---

[11] No evidence has been presented as to whether Ms. Jackson eventually received an opportunity for a grievance hearing, or if/how Physicians Group followed up on the December 12, 2006 promise of a grievance hearing, described above.

problems that Ms. McElroy was having in trying to locate a home in the Lehigh Valley to purchase for her family.  Def.'s Ex. A, Jackson Dep. at 130-32.  In the course of the conversation, Ms. McElroy commented to Ms. Jackson, "I'm tired of all you people coming over here and buying up all of our homes."  Id. at 130.

Ms. McElroy testified that her comment's reference to "you people" meant "people from New York and New Jersey" and that she knew Ms. Jackson was from New Jersey.  Def.'s Ex. I, McElroy Dep. at 73.  Ms. Jackson agrees that the comment was not related to race,[12] and she never complained to Ms. McElroy or to PHYSICIANS GROUP management that about the comment.  Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at ¶¶ 96-97.  Explaining her failure to complain, Ms. Jackson points out that she had been counseled by Ms. Tkach on March 1 that "unkind behavior would not be tolerated."  Id. at ¶ 96.

Q.     *The Assault*

1.     *Physical Contact Between Ms. McElroy and Ms. Jackson*

At approximately 8:30 a.m. on March 17, 2006, Ms. Jackson was seated and working at her desk, behind which a computer was located.  Def.'s Ex. W, Physicians Group Incident Report; Def.'s Ex. I, McElroy Dep. at 61.  Ms. McElroy testified that she passed behind Ms. Jackson's chair to retrieve an arrival slip from the computer, but that she misjudged the available space and her posterior accidentally struck Ms. Jackson and/or her chair, which pushed the chair forward and caused Ms. Jackson's knee to strike the edge of the desk.  Id. at 61-64. [13]

---

[12]  This is the position that Ms. Jackson takes in her brief.  However, Ms. Jackson testified at her deposition that she *did* believe Ms. McElroy's "you people" comment was racist.  See Pl.'s Ex. 2, Jackson Dep. at 133.

[13]  The parties agree that at that time, Ms. McElroy was approximately seven months pregnant and her belly was large.  Def.'s Ex. I, McElroy Dep. at 62.

Ms. Jackson describes the incident quite differently, stating that Ms. McElroy "literally pushed my chair that I was sitting on" and "hip-checked" Ms. Jackson, driving her knee in to the desk with enough force to cause severe pain and cause her knee to immediately swell up to the "size of grape fruit." Pl.'s Ex. 2, Jackson Dep. at 121, 123. Ms. Jackson screamed in pain, other co-workers in the area fled, and Ms. McElroy told Ms. Jackson to "get over it." Id. at 121, 355. Ms. Jackson then went to Ms. Tkach's office and presented her with the swollen knee, at which time Ms. Tkach immediately called for her secretary to get a wheel chair and take Ms. Jackson to the emergency area. Id. at 357-58; Pl.'s Ex. 11, Tkach Notes from Mar. 17, 2006.

*2. Physician Group's Investigation of the Assault*

Physician Group interviewed certain employees who witnessed the assault, but did not interview Ms. Jackson.[14] Pl.'s Ex. 2, Jackson Dep. at 364; Def.'s Ex. Y, Tkach Dec. at ¶ 5. Indeed, Ms. Jackson contends that she was *never* actually interviewed or questioned by Physicians Group about the assault. Pl.'s Ex. 2, Jackson Dep. at 364.

Shortly after the assault, Ms. Tkach told Network's corporate human resources department that she "was not able to investigate fully," and the human resources department told Ms. Tkach that "nothing else needed to be done today." Pl.'s Ex. 11, Tkach Notes from Mar. 17, 2006. Also, before closing the conversation with the human resources department, Ms. Tkach stated that "this was not the first incident with both employees." Id.

---

[14] Ms. Jackson asserts that she was in the process of being written up by Ms. Tkach for an event that occurred a month prior. Indeed, the evidence reflects that Ms. Tkach's negative Personnel Report about Ms. Jackson was dated March 20, 2006, which was one business day after the so-called assault on Ms. Jackson. This Personnel Report included a written reprimand accusing Ms. Jackson of not giving guidance to a float employee, one month prior. See above discussion regarding March 20 Personnel Report.

Physicians Group points out that although Ms. Jackson was not interviewed or questioned about the assault, she was able to speak with Ms. Tkach about the incident while she was on her way to the emergency room. Def.'s Ex. Y, Tkach Dec. at ¶ 4. In support, Physicians Group points to Ms. Jackson's deposition testimony that, following the incident, she told Ms. Tkach that she had been "assaulted" by Ms. McElroy and that she was "able to give [her] side of the story."[15] Physicians Group also points to an Employee Incident Report that Ms. Jackson filed after the incident, in which she stated "Patty McElroy – pushed me into the counter – and my [left] knee hit the desk." Def.'s Ex. W, Empoyee Incident Report.

### 3. Physicians Group's Conclusion Regarding the Assault

After the interviews, Ms. Tkach concluded that there was no evidence that the assault was intentional, and informed Ms. Jackson of her conclusion during a meeting that occurred on or about March 21, 2006. Def.'s Ex. Y, Tkach Dec. at ¶ 5. Specifically, Ms. Jackson was told

---

[15] The relevant excerpt from Ms. Jackson's deposition is as follows:

> Q: On March 17th, any time on March 17th did you tell Sandra Tkach what happened?
> A: Yes.
> Q: So you were able to give your side of the story to Sandra Tkach?
> A: Correct.
> . . .
> Q: You said earlier that no one questioned you about this incident, didn't you?
> A: Yes.
> Q: That's not true, is it?
> A: Sandra [Tkach] and I did not have enough time to go over a sufficient questioning. She did not allow me. I couldn't stand there in pain. I went to the emergency room. She was aware that Patty [McElroy] had assaulted me and that's as far as we got.
> Q: Because you told her?
> A: Correct.

Def.'s Exhibit 1, Jackson Dep. at 143-44.

that she would be "expected to work side by side [with Ms. McElroy] . . . in a professional manner." Pl.'s Ex. 11, Tkach Notes from Mar. 21, 2006.

### 4. Connection to "You People" Comment

Ms. McElroy testified that she believed there was no connection between the so-called "assault" or "bumping" incident and the "you people" comment that she had made three or four days prior. Def.'s Ex. I, McElroy Dep. at 76. By contrast, Ms. Jackson appears to assert that there *is* such a connection, inasmuch as the so-called assault was motivated by the same hostility that Ms. Jackson believes motivated the "you people" comment. See Pl.'s Opp. to Def.'s Mot. for Summ. J. and Resp. to Statement of Facts at 50-51.

### 5. Aftermath of Assault Incident

Ms. Jackson never complained to Ms. McElroy about this incident. Def.'s Ex. I, McElroy Dep. at 65. Ms. McElroy testified at her deposition that she still considered Ms. Jackson to be a close friend, but Ms. Jackson disagreed that the women were close friends. Id. at 40-41, 52; Pl.'s Ex. 2, Jackson Dep. at 133. The evidence reflects that, following the assault incident, Ms. Jackson gave a baby shower gift to Ms. McElroy, which she had previously purchased. Id. at 132-33.

## III. STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing, that is, the non-moving party. Anderson, 477 U.S. at 255.

Although summary judgment can be granted when an appropriate showing has been made, the Court must be careful not to overstep its role. As the Supreme Court stated more than fifty years ago, "maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 501 (1959) (internal citations omitted).

IV.    DISCUSSION

A.    *Title VII and PHRA Discrimination Claims* [6]1

Ms. Jackson's race discrimination claims are analyzed under the burden-shifting analysis

developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[17]

1.    *Prima Facie Case and Burden-Shifting*

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of

discrimination by a preponderance of the evidence, Texas Dep't of Community Affairs v.

Burdine, 450 U.S. 248, 252-253 (1981), which merely requires that she "present sufficient

evidence to allow a fact finder to conclude that the employer is treating some people less

favorably than others based on a trait that is protected under Title VII [of the Civil Rights Act of

---

[16]  Because the analysis required for addressing Ms. Jackson's Title VII and PHRA claims is identical, the Court will consider these claims together.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317, n.3 (2000) (stating that the analysis required for adjudicating a PHRA claim is identical to a Title VII inquiry and "we therefore do not need to separately address" the PHRA claim).

[17]  Ms. Jackson concedes that the "you people" comment was not related to race, and does not present any other evidence of discrimination that possibly could be considered direct evidence. Therefore, the Court proceeds to analyze Ms. Jackson's claims under the McDonnell Douglas framework.  See Dempsey v. Del. Dep't of Pub. Safety, No. 08-4406, 2009 U.S. App. LEXIS 28710, **2-3 (3d Cir. Sept. 30, 2009) (non-precedential) ("In the absence of direct evidence of discrimination (as in the present case) a plaintiff may prove discrimination according to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.3d 2d 668 (1973)."); Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (explaining that without direct evidence of discrimination, a plaintiff must proceed under the McDonnell Douglas framework); Wurtz v. Day and Zimmerman, Inc., No. 08-3503, 2009 U.S. Dist. LEXIS 120610, *8, n.7 (E.D. Pa. Dec. 28, 2009) (same); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 584 (2007) ("In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting evidentiary burdens imposed under the framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).").

1964].” Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999). “The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that [P]laintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination could be a reason for the employer's action.” Coulton v. University of Pennsylvania, 2006 U.S. Dist. LEXIS 12459, 2006 WL 759701, at *5 (E.D. Pa. Mar. 21, 2006) (quoting Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. I 996) (emphasis in original)); see also Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1993).

To establish a prima facie case of race discrimination, Ms. Jackson must show that: (1) she is a member of a protected class, (2) she was qualified for the position, and that (3) she was subject to an adverse employment action (4) under circumstances that give rise to an inference of discrimination. Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 95 (3d Cir. 2005) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000)). If the plaintiff succeeds in showing the prima facie case, the burden shifts[18] to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. Burdine, 450 U.S. at 252-253. This is a “relatively light burden” because the defendant “need not prove that the tendered reason actually motivated its behavior,” but only that it may have. Robinson v. PFPC, Inc., No. 08-5113, 210 U.S. Dist. LEXIS 19303, at *7 (E.D. Pa. Mar. 4, 2010) (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)). If the defendant carries this burden, the presumption of unlawful discrimination is rebutted. St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Burdine, 450 U.S. at 255 & n.10 (internal citation omitted)). Then, in order to defeat summary judgment, the plaintiff must show that the defendant's stated reason for its action was pretextual, by pointing to “some

---

[18] Although the McDonnell Douglas framework shifts the burden of production to the defendant, the ultimate burden of persuasion always remains with the plaintiff. Burdine, 450 U.S. at 253.

evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Iadimarco, 190 F.3d at 166 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

Here, Physicians Group agrees that Ms. Jackson can satisfy the first three prongs of her prima facie case, but argues that she cannot satisfy the fourth prong – that is, she cannot show that she was terminated under circumstances that could give rise to an inference of discrimination. In considering the fourth prong, courts must keep in mind that the prima facie test is "flexible," and "must be tailored to fit the specific context in which it is applied." Sarullo v. United States Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003). In particular, the Third Circuit Court of Appeals has rejected the view that a plaintiff must compare herself to a similarly-situated individual from outside her protected class in order to raise an inference of unlawful discrimination. See id. at 798, n.7. Instead, a plaintiff simply "must establish some causal nexus between [her] membership in a protected class" and the adverse employment decision being complained of. Sarullo, 352 F.3d at 798, n.7. One way in which this may be done is for the plaintiff to show that a similarly-situated employee outside of the protected class is treated differently from the plaintiff herself. Robinson v. PFPC, Inc., No. 08-5113, 2010 U.S. Dist. LEXIS 19303, *8 (E.D. Pa. Mar. 4, 2010); see Wooler v. Citizens Bank, 2006 U.S. Dist. LEXIS 86606, at *16 (E.D. Pa. 2006) ("[c]ommon circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class."); Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 602 (M.D. Pa. 2002). For co-employees to be

"similarly situated," they must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." McCormick v. Allegheny Valley School, No. 06-3332, 2008 U.S. Dist. LEXIS 8533, **28-29 (E.D. Pa. Feb. 6, 2008); see Briggs v. Pennsylvania Department of Transportation, No. 07-0118, 2009 U.S. Dist. LEXIS 69214, *21 (W.D. Pa. Aug. 7, 2009); Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994). They must also have "dealt with the same supervisor" and been "subject to the same standards." Opsatnik v. Norfolk Southern Corp., No. 08-2177, 2009 U.S. App. LEXIS 14993, *7 (3d Cir. July 7, 2009).

Physicians Group argues that Ms. Jackson cannot show that she was terminated under circumstances giving rise to an inference of discrimination, because Physicians Group treated Ms. Jackson in the same manner as it treated a "similarly situated" white medical assistant, Ms. McElroy. This argument is unavailing at this stage because (1) there is no requirement that a plaintiff compare herself with a similarly situated person outside the protected class, though such comparisons may be helpful in some cases when proving or disproving an inference of discrimination; and (2) there are abundant factual disputes in this record regarding the differences between Ms. Jackson's conduct and that of Ms. McElroy, and between Ms. Jackson's termination and that of Ms. McElroy, which may preclude Ms. McElroy from being a "similarly situated" employee comparator.

For instance, Ms. Jackson presents evidence that on March 20, 2006, Ms. McElroy was given a full opportunity to participate in the interview process and explain her so-called assault of Ms. Jackson. By contrast, Ms. Jackson was not given a similar opportunity to participate in the interview process. The Court cannot credit Physician Group's argument that Ms. Jackson

had a similar opportunity to "tell her side of the story" merely because she made some brief

statements to Ms. Tkach right after the assault incident, when she claims she was still in pain and

en route to the emergency room, and because she subsequently filed an Employee Incident

Report.  The following excerpt from Ms. Jackson's deposition is illustrative:

> Q: On March 17th, any time on March 17th did you tell Sandra Tkach what happened?
> A: Yes.
> Q: So you were able to give your side of the story to Sandra Tkach?
> A: Correct.
> . . .
> Q: You said earlier that no one questioned you about this incident, didn't you?
> A: Yes.
> Q: That's not true, is it?
> A: Sandra [Tkach] and I did not have enough time to go over a sufficient questioning.  She did not allow me.  I couldn't stand there in pain.  I went to the emergency room.  She was aware that Patty [McElroy] had assaulted me and that's as far as we got.
> Q: Because you told her?
> A: Correct.

Def.'s Ex. A, Jackson Dep. at 145.  The record contains evidence that Physicians Group actively

sought out Ms. McElroy's perspective on the so-called assault, and sought out the perspectives

of others, but did not seek out the perspective of Ms. Jackson.  Physicians Group's arguably

uneven interview process and investigation, which may be assessed as treating Ms. Jackson

differently from Ms. McElroy, resulted in Ms. Tkach and Mr. Eggen's conclusion that "after all

the interviews it was found that the [assault] incident was not intentional."

Further, the evidence can support a conclusion that Ms. McElroy was terminated in part

for the chair-bumping/assault incident of Ms. Jackson, and not for her alleged mistreatment of

Ms. Olivera.  This could support a reasonable inference that Physicians Group might not have

terminated Ms. McElroy *but for* the assault incident, whereas Physicians Group terminated Ms.

Jackson *solely* for her treatment of Ms. Olivera.  Stated another way, the evidence could support

a reasonable inference that the mere mistreatment of Ms. Olivera was sufficient to get Ms. Jackson fired, but was not sufficient to get Ms. McElroy fired.

There is also a dispute as to the way that Physicians Group handled the grievance hearing requests from Ms. Jackson and Ms. McElroy. Ms. Jackson points out that shortly after their terminations, both she and Ms. McElroy initiated conversations with Ms. Bulishak, Network Ombudsman, to commence grievance procedures. Ms. McElroy's conversations resulted in a handwritten request to Mr. Eggen by Ms. Bulishak on behalf of Ms. McElroy. Ms. Jackson, on the other hand, testified that she received no similar assistance or meaningful response to her request (though she acknowledged that she did receive the *promise* of a hearing for December 12, 2006), and was told that the grievance committee members were not "wasting their time" to hear her side of the story.[19]

In addition to pointing out differences between the way Physicians Group treated her as compared with Ms. McElroy, Ms. Jackson also points out differences between the way Physicians Group treated Ms. Jackson as compared with Ms. Olivera. Ms. Jackson submits evidence that she (Ms. Jackson) was disciplined for supposedly disrespecting and demeaning Ms. Olivera, but Ms. Olivera was not disciplined for disrespecting and demeaning Ms. Jackson.[20] Ms. Jackson also submits evidence that the various complaints made by or on behalf of Ms.

---

[19] Ms. Jackson does not explain what happened to the promise of a hearing that she received (though not directly) from Physicians Group on December 12, 2006.

[20] Ms. Jackson presents evidence that she was demeaned and disrespected by Ms. Olivera on two occasions, as when Ms. Olivera requested a second opinion from Ms. McElroy regarding instructions she received from Ms. Jackson, right in front of Ms. Jackson herself. Notably, however, Ms. Jackson does not point to any evidence that she actually *complained* about these two occasions to anyone at Physicians Group, the way that Ms. Olivera complained to multiple people at Physicians Group.

Olivera resulted in "exploratory" discussions between Ms. Tkach, Dr. Boulay, Dr. Shalaby, Ms. Pauls, Mr. Eggen and/or Ms. Olivera. These discussions, in turn, led to summary reprimands and termination of Ms. Jackson, perhaps without ever giving Ms. Jackson a real opportunity to explain her side of the story.

Based on all the evidence presented and the factual disputes discussed above, the Court concludes that Ms. Jackson can establish a <u>prima</u> <u>facie</u> case of discrimination for purposes of summary judgment.

2. *Alternative Argument: No Evidence of Pretext*

After Ms. Jackson establishes a <u>prima</u> <u>facie</u> case of discrimination, the burden shifts to Physicians Group to proffer a legitimate, non-discriminatory reason for Ms. Jackson's termination. Physicians Group has done so, by asserting that Ms. Jackson was terminated for exhibiting disrespectful behavior and being a source of staff conflict. The burden then shifts to Ms. Jackson to show that this reason is pretextual.

Staff conflict is a legitimate, nondiscriminatory reason for discipline. <u>McCormick v. Allegheny Valley School</u>, No. 06-3332, 2008 U.S. Dist. LEXIS 8533, *42 (E.D. Pa. Feb. 6, 2008); <u>Palma v. Volunteers of America</u>, No. 04-919, 2006 U.S. Dist. LEXIS 5176, *17 (E.D. Pa. Feb. 10, 2006). In such cases, it is the employer's belief that governs, and a plaintiff cannot establish pretext by simply challenging the veracity of co-workers' accusations that the employer reasonably credited. <u>McCormick</u>, 2008 U.S. Dist. LEXIS 8533, at *43; <u>Coulton v. University of Pennsylvania</u>, No. 05-1446, 2006 U.S. Dist. LEXIS 12459, *26 (E.D. Pa. March 22, 2006). A plaintiff must do more than show the employer's disciplinary decision was wrong or mistaken; she must provide evidence from which a reasonable factfinder could infer that the employer's

disciplinary grounds were "either a post hoc fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 765; see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000); Texas Dept. of Community Affairs v. Burdineu, 450 U.S. 248, 254-6 (1981). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in [the defendant's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.2d at 765.

Physicians Group argues that even if it did fail to adequately investigate the assault incident, as well as Ms. Olivera's various complaints, one faulty investigation is not sufficient to establish pretext. In support, Physicians Group cites several cases in which courts determined that faulty investigations alone did not support reasonable inferences of discrimination. See Money v. Provident Mutual Life Insurance Co., 189 Fed. Appx. 114, 116-17 (3d Cir. 2006); Geddis v. University of Delaware; 40 Fed. Appx. 650, 653 (3d Cir. 2002); Thomas v. Fairmount Behavioral Health System, No. 06-523, 2007 U.S. Dist. LEXIS 58115, *24-25 (E.D. Pa. Aug. 9, 2007); Reynolds v. Metropolitan Life Insurance Co., No. 04-232, 2007 U.S. Dist. LEXIS 12227, *20-21 (W.D. Pa. Feb. 22, 2007). In those cases, the faulty investigations at issue were determined to be nothing more than incorrect or mistaken employment decisions. Here, it is not clear whether Physicians Group's several questionable investigations were *merely* incorrect or mistaken employment decisions, or whether they were motivated - in whole or in part - by racial bias. The lack of clarity is precisely why summary judgment is not appropriate.

The Court must look at all of the evidence in context, including but not limited to:  Ms.

Jackson's status as the only black employee,[21] Physicians Group's arguably lopsided

investigations of the incidents involving Ms. Jackson,[22] Ms. Tkach's failure to invite Ms. Jackson

to the third photo shoot,[23] and Physicians Group's failure to provide Ms. Jackson with a post-

---

[21]  On the one hand, being the only minority employee in a department is not a "free-for-all" pass allowing a person to claim discrimination just because he or she was treated in an adverse manner.  On the other hand, in some circumstances it may be reasonable to infer that an employer who consistently mistreats its only black employee, allows/arranges for her to be left out of a Department brochure photo, and doesn't seek out "her side of the story" in serious workplace disputes while seeking out the opinions of non-black employees, may be doing so for race-related reasons.  A jury must resolve the dispute.

[22]  Depending on how the beginning and end of each "investigation" is defined, the sheer number of faulty or uneven investigations alone may give pause.  Ms. Jackson poses the argument this way:

> One faulty investigation does not create pretext (i.e. March 20, 2006 – "the Assault") . . . two faulty investigations may not create pretext (the Blood Pressure Report of May 2006) . . . three faulty investigations should raise an eyebrow (i.e. the lost photos) . . . four faulty investigations should gather attention (i.e. the Pauls/Shalaby letters of September 13&14, 2006)…five faulty investigations should raise an alert (i.e. the Dr. Boulay letter of September 19, 2006) . . . six faulty investigations should initiate an inquiry (i.e. September 27 Termination/Removal on discredited grounds) . . . eight faulty investigations is astonishing (i.e. failure to accommodate [Ms. Jackson's] formal complaint of "harassment" and "bias") . . . nine faulty investigations in seven (7) months is just plain pretex[t]ual discriminatory animus (i.e. Grievance refusal)."

Pl. Mem. of Law at 44.

[23]  Physicians Group argues that Ms. Jackson does not have evidence that Ms. Tkach's "lost photo" explanation was false.  While a jury may well conclude that that is true, the record includes evidence that Ms. Tkach decided to re-take the photo by way of a third photo shoot *without inviting* Ms. Jackson, the only black employee, and then use a photo from the third photo shoot in the brochure.  This decision, combined with Physicians Group's other employment actions discussed above, may support a reasonable inference of discriminatory animus.

Physicians Group points to the fact that two other, non-black employees people were also excluded from the brochure photo.  However, the evidence reflects that there were specific, uncontradicted reasons to exclude those employees from the photo – namely, that one of them was out on maternity leave, and the other was going to school part-time and had been omitted from prior photos.  By contrast, Ms. Jackson did not receive an *invitation* to the third  (cont...)

termination grievance hearing while providing a hearing for Ms. McElroy.[24]  Looking at the case as a whole, Ms. Jackson has presented sufficient evidence to raise an inference of discriminatory animus at least sufficient to defeat summary judgment.

B.    *Title VII and PHRA Retaliation Claims*

1.    *Prima Facie Case and Burden-Shifting*

In order to make out a prima facie case of retaliation under Title VII, an employee must demonstrate that (1) she engaged in a protected activity as defined by the Act; (2) her employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link between the protected activity and the adverse employment action exists.  Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001); Perry v. Harvey, No. 08-3339, 2009 U.S. App. LEXIS 12441, *8 (3d Cir. June 5, 2009).  If the employee establishes this prima facie case of retaliation, then the McDonnell Douglas analysis applies and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for any adverse employment actions.  Once the employer meets "this relatively light burden," Ms. Jackson must show by a preponderance of the evidence that the employer's reason is pretextual.  See Weiler v. R&T

---

(cont...)  photo shoot for reasons that have never been articulated or explained.  Physicians Group's observation that Ms. Jackson was out of the office on the day of the third photo shoot does not resolve the issue, as it is not clear whether Physicians Group learned of Ms. Jackson's absence from the office *prior to* the photo being taken (which might have – though not necessarily would have – explained the failure to invite Ms. Jackson to the group photo), or *after* the photo had already been taken (which would not have explained the failure to invite Ms. Jackson).

[24]  There is evidence that at some point, Physicians Group offered to have a grievance hearing December 12, 2006.  However, it is not clear when this offer was made and under what circumstances, or why the grievance hearing was not held.

Mech. Inc., 255 Fed. Appx. 665, 2007 U.S. App. LEXIS 25803 at *5-6 (3d Cir. 2007); Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006).

        *2.     Protected Activity*

A plaintiff may engage in protected activity by opposing unlawful discrimination. Moore, 461 F.3d at 343. Protected activity includes complaints about unlawful employment practices that are made to a supervisor or other member of management. See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135-36 (3d Cir. 2006); Alderfer v. Nibco Inc., No. 98-6654, 1999 U.S. Dist. LEXIS 16083, at*2 (E.D. Pa. 1999). A plaintiff need not prove the merits of the underlying claim, but only that she had a good faith reasonable belief that the employer's conduct was unlawful. Wilkerson v. New Media Technology Charter School Inc. 522 F.3d 315, 322 (3d Cir. 2008). However, general complaints of unfair treatment do not constitute "protected activity." Slagle v. County of Clarion, 435 F.3d 262, 267-68 (3d. Cir. 2006). To decide whether a plaintiff has engaged in protected conduct, the Court must "look to the message being conveyed rather than the means of conveyance." Curay-Cramer, 450 F.3d at 135; see also Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (letter to an employer's human resources department was not protected activity because it did not specifically complain about age discrimination and it neither "explicitly or implicitly" alleged that a protected characteristic was the basis for the adverse employment action).

Physicians Group argues that Ms. Jackson cannot establish a prima facie case of retaliation because Ms. Jackson never engaged in protected activity, having complained of "bias" and "harassment" but never specifically of "racial" bias. In support, Physicians Group cites a handful of cases in which courts have held that general complaints of unfair treatment

were too vague to constitute protected conduct.[25]   However, Physicians Group fails to

acknowledge that protected activity may be implicit as well as explicit.  See Curay-Cramer, 450

F.3d 135 ("case law has established that opposition to an illegal employment practice must

identify the employer and the practice - if not specifically, at least by context" and holding that

plaintiff's letter to his employer, in which plaintiff expressed that he thought a particular

employment position was given to a less qualified person than himself, was "too vague to

constitute opposition to an unlawful employment practice of his employer because it neither

'explicitly or implicitly' alleged that a protected characteristic was the basis for the adverse

employment action") (internal citations omitted).   "When deciding whether a plaintiff has

engaged in opposition conduct, we look to the message being conveyed rather than the means of

conveyance."  Id. (internal citations omitted).

        Here, viewing the evidence in the light most favorable to Ms. Jackson and within the

context of this case, the Court concludes that a reasonable person in Ms. Tkach's position would

---

[25]   See Barber, 68 F.3d at 701-02 ("Thus, the statute provides that a person has engaged in
'protected conduct' when s/he opposes discrimination on the basis of age.  It is clear from
Barber's letter that he felt that he had been treated unfairly as he stated that 'the position was
awarded to a less qualified individual.' However, that letter does not explicitly or implicitly
allege that age was the reason for the alleged unfairness.  A general complaint of unfair
treatment does not translate into a charge of illegal age discrimination."); Pawlak v. Seven
Eventeen HB Philadelphia Corp., No. 99-5390, 2005 U.S. Dist. LEXIS 4712, **32 (E.D. Pa.
Mar. 25, 2005) ("Opposition to the merits of a business decision, without an allegation of illegal
race discrimination, cannot constitute protected activity under the PHRA."); Gautney v.
Amerigas Propane, Inc. 107 F.Supp.2d 634, 645-46 (E.D. Pa. 2000) ("At best, the evidence here
is that Gautney complained in general terms that she thought she was being treated differently.
None of the evidence, however, supports an inference that her supervisors knew she was
complaining of gender or sex discrimination . . . A mere reference to being treated differently or
unfairly . . . is insufficient to establish that she engaged in a protected activity").  See also Sosky
v. Int'l Mill Serv. Inc., No. 94-2833, 1996 U.S. Dist. LEXIS 791, **6, 33-34 (E.D. Pa. Jan. 25,
1996) (general complaint of "unfair treatment" to Human Resources Department, with no
suggestion that the treatment was the result of age discrimination, is not a protected activity),
aff'd. 103 F.3d 114 (3d Cir. 1996).

have understood Ms. Jackson's complaint of "bias" and "harassment" as referring to racial bias. The word "bias" itself connotes an improper prejudice or favoritism of some sort, though not necessarily regarding a protected class. Significantly, however, Ms. Jackson was the only black employee in the Department at the time of her complaint to Ms. Tkach, which reasonably could give a racial connotation to any complaint of "bias." Also, the complaint was made directly to Ms. Tkach, who was, as noted above, directly involved in the alleged pattern of discrimination about which Ms. Jackson complains. It is reasonable to infer that a woman discriminating against Ms. Jackson on the basis of her race would receive and understand that Ms. Jackson's complaint of "bias," under the circumstances presented here, was referring to racial discrimination.[26]

The Court is mindful that the evidence on this point is very thin, and Ms. Jackson may have a difficult time proving her case at trial. Viewed in the light most favorable to Ms. Jackson, however, the evidence could support a reasonable inference that Ms. Jackson was opposing conduct made unlawful by Title VII, and that a reasonable person would have understood her

---

[26] Physicians Group cites Kaniuka v. Good Shepard Home, No. 05-2917, 2006 U.S. Dist. LEXIS 57403 (E.D. Pa. Aug. 15, 2006), in which the court stated that "[i]nformal charges or complaints of discrimination, as well as informal requests for accommodation, are sufficient to constitute protected activities for establishing a prima facie case of retaliation . . . . However, even informal charges, complaints, or requests for working accommodations must at least mention the type of discrimination claimed." Id. at *29.

A closer look at Kaniuka reveals that it is distinguishable on its facts. Kaniuka involved alleged violations of the ADA, in which the asserted "protected activity" was a doctor's note that stated, in its entirety, that the plaintiff had been under the doctor's care for a period of time and would soon be released to work. The plaintiff in Kaniuka did not allege that she was being treated with "bias" or discriminated against in any way, and the attendant circumstances in Kaniuka did not make clear that the plaintiff was complaining of bias or discrimination on the basis of disability. Here, by contrast, Ms. Jackson specifically complained of "bias," and the attendant circumstances reasonably could support a jury finding that her complaint was one for *racial* bias and discrimination.

complaint as such. Therefore, at the summary judgment stage, there is sufficient evidence to support a reasonable inference that Ms. Jackson engaged in activity protected by Title VII.[28]

### 3.    *Connection Between Protected Conduct and Termination*

Physicians Group also argues that Ms. Jackson cannot show a causal link between her protected conduct and the criticism she received from Physicians Group – which led to her termination - because Physicians Group already had warned Ms. Jackson about her behavior by the time Ms. Jackson complained about bias and harassment.  Indeed, the caselaw reflects that no retaliatory inference arises when an employer expresses concerns about an employee's misconduct before that employee engages in allegedly protected activity, and expresses similar concerns after that employee engages in allegedly protected activity.  Shaner v. Synthes (USA), 204 F.3d 494, 504-05 (3d Cir. 2000); Helfrich v. Lehigh Valley Hosp., No. 03-5793, 2005 U.S. Dist. LEXIS 4420, **66-67 (E.D. Pa. Mar. 22, 2005).

That being said, the evidence reflects that Ms. Jackson was terminated only two days after her complaint of "bias."  This strong temporal association, viewed in the context of this case, is sufficient to suggest a causal connection between Ms. Jackson's protected conduct and her termination.  See Shellenberger v. Summit Bancorp Inc., 318 F.3d 183, 189 (3d Cir. 2003) (holding that temporal proximity alone may be sufficient to establish the causal connection required for the prima facie case, or may be considered along with other factors in establishing the requisite causal connection); Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (noting that "when only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn" and holding that three-month period between

protected activity and adverse action raises inference of retaliation). Cf. Washco v. Federal Express Corp., 402 F. Supp. 2d 547, 559-60 (E.D. Pa. 2005) (dismissing plaintiff's retaliation claim where five months passed between the protected activity and adverse action). This is true even though Ms. Jackson was criticized by Physicians Group both before and after her protected activity.

### 4. Pretext

Physicians Group further argues that, in the event Ms. Jackson is able to establish a prima facie case of retaliation, she cannot show pretext because Ms. Jackson (who allegedly engaged in protected activity) and Ms. McElroy (who did not) received "identical punishments for identical conduct by identical decision-makers." Def.'s Mem. of Law at 22. Further, Physicians Group asserts that its decision to terminate Ms. Jackson was supported by well-documented, non-retaliatory reasons, including Ms. Jackson's rude, disrespectful treatment of co-employees and her refusal to accept responsibility for same.

These arguments regarding pretext echo the ones made with respect to Ms. Jackson's discrimination claim, as discussed above, and, given the disputed factual record in this case, the Court rejects them for much the same reasons. Considering the evidence of Ms. Jackson's complaint of "bias" and "harassment" and her termination only two days later, Ms. Jackson's status as the only black employee at Physicians Group, and the evidence of discrimination and unfair treatment without explanation, Ms. Jackson has presented sufficient evidence to create a factual dispute as to the real reasons for her termination and to raise an inference of retaliation. Therefore, summary judgment cannot be granted on Ms. Jackson's retaliation claim.

*C.*     *Intentional Infliction of Emotional Distress*

    *1.*     *The Workers' Compensation Act and the Personal Animus Exception*

The Pennsylvania Workers' Compensation Act "provides the exclusive remedy for all employees' work-related injuries." McInerney v. Moyer Lumber & Hardware, Inc., 244 F. Supp. 2d 393, 400 (E.D. Pa. 2002) (citing 77 Pa. Cons. Stat. Ann. § 481(a)). However, the statute recognizes a limited exception, known as the "personal animus" or "third party attack" exception, which permits claims for "employee injuries caused by the intentional conduct of third parties for reasons personal to the tortfeasor and not directed against him as an employee or because of his employment." McInerney, 244 F. Supp. 2d at 400 (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 160 (3d Cir. 1999)). See also Huggins v. Coatesville Area School District, No. 07-4917, 2008 U.S. Dist. LEXIS 65604, at **40-41 (E.D. Pa. Aug. 27, 2008). "The 'critical inquiry in determining the applicability of the third-party attack exception is whether the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship.'" McInerney, 244 F. Supp. 2d at 400 (quoting Fugarino v. Univ. Servs., 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000)). In other words, "the plaintiff must demonstrate that an individual *other than the employer* acted in a tortious manner unrelated to the plaintiff's status as employee." Jamison v. Campbell Chain Cooper Tool, No. 07-0324, 2008 U.S. Dist. LEXIS 24896, at *9 (M.D. Pa. March 27, 2008) (emphasis in original); see also Hettler v. Zany Brainy, Inc., No. 99-3879, 2000 U.S. Dist. LEXIS 14537, at *13 (E.D. Pa. Sept. 26, 2000).

For conduct to fall within the personal animus exception, it "cannot be one which would be expected in the workplace." Hettler, 2000 U.S. Dist. LEXIS 14537, at *13. The Third Circuit

Court of Appeals "understand[s] Pennsylvania law to extend workers' compensation preemption to personal animosity that develops from work-related events." Durham Life Ins. Co., 166 F.3d at 160, n.16. Additionally, "Pennsylvania law presumes that an injury is work-related [and therefore not covered by the personal animus exception] when it occurs on the employer's premises." Mahoney, 2006 U.S. Dist. LEXIS 27859, at **9, 13 (internal citations omitted); accord Ahmed v. Lowe's Company Inc., No. 06-4798, 2008 U.S. Dist. LEXIS 58568, at *23-24 (E.D. Pa. July 31, 2008), aff'd 2009 U.S. App. LEXIS 201111 (3d Cir. Sept. 9, 2009).

The Court addressed the personal animus exception in its January 29, 2009 Memorandum on Physicians Group's Motion to Dismiss:

> with the personal animus exception, the linchpin for the "extreme and outrageous" element is the alleged assault of Ms. Jackson. Depending on the attendant circumstances, this aggressive conduct may be sufficiently "extreme and outrageous" to support a claim for intentional infliction of emotional distress . . .

January 29, 2009 Memorandum at 21. However, the Court's early recognition that the assault on Ms. Jackson *could* form the basis for Physicians Group's liability, is by no means a suggestion that it *does* form the basis for such liability in the absence of supporting evidence. Even assuming arguendo that the personal animus and the "extreme and outrageous" requirements can be met here,[27] there is no basis for holding Physicians Group liable for the assault.

---

[27] Following the Court's lead and focusing on the so-called assault between Ms. McElroy and Ms. Jackson, Physicians Group argues that the personal animus exception does not apply here because the physical altercation between Ms. McElroy and Ms. Jackson was not motivated by personal animus. Physicians Group contends that the assault was accidental and unrelated to Ms. McElroy's earlier "you people" comment, and that Ms. Jackson remained friends with Ms. McElroy afterwards. According to Physicians Group, the "assault" was nothing more than "a seven-month pregnant [Ms. McElroy] accidentally bumping her seated friend with her posterior while attempting to retrieve a work document from a computer." Def.'s Mem. of Law at 26. Physicians Group also argues that it is entitled to summary judgment on Ms. Jackson's IIED claim because the conduct of which Ms. Jackson complains was not "so outrageous, and extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, (cont...)

When an employee brings an IIED claim for an intentional act by a co-employee, the personal animus exception does not relieve the employee from showing that a basis for employer liability exists.  See Price v. Phila. Electric Co., 790 F. Supp. 97, 100, n.7 (E.D. Pa. 1992) (denying the motion to dismiss an employee plaintiff's IIED claim against his employer, and holding that the plaintiff could proceed with his claim under the "personal animus exception" to the Workers' Compensation Act, but also noting that plaintiff would still have to "establish that the employer should be liable for the employees' conduct"); Lang v. Seiko Instruments USA, Inc., 1997 U.S. Dist. LEXIS 167 (E.D. Pa. Aug. 15, 1990) ("Having stated a claim which is excepted from the WCA's exclusivity provision, the plaintiff must of course articulate a legal theory upon which to establish the defendant's liability.").  Indeed, "[i]t is well-established that finding that a claim is not preempted by the [Workers' Compensation Act] does not necessarily render it cognizable."  Williams v. U.S. Airways, Inc., No. 06-4797, 2007 U.S. Dist. LEXIS 65799, *8 (E.D. Pa. Sept. 6, 2007).  "While there is an inherent paradox in holding an employer liable for actions that are sufficiently removed from the workplace to be subject to the personal animus exception, the tension is mitigated to an extent by the principle that an intentional tort that is not preempted by the [Workers' Compensation Act] cannot be asserted against an employer under a theory of vicarious liability."  Id.

Here, Ms. Jackson has not asserted or presented any evidence that Physicians Group's acts or omissions somehow contributed to Ms. McElroy's action of shoving Ms. Jackson against the desk, that Physicians Group was negligent toward Ms. Jackson in failing to prevent the

---

(cont...) and utterly intolerable in a civilized community."  Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988).  These issues are close, and ultimately the Court need not decide them because, as explained infra, Ms. Jackson has failed to present any evidence or arguments to form a basis for holding Physicians Group liable for the assault.

assault, or that Physicians Group otherwise should be held liable for the incident.[28]  The Court

previously identified the assault as the "linchpin" of Ms. Jackson's IIED claim, but Ms. Jackson

has offered no theory, arguments, assertions or evidence to establish Physicians Group's liability

for the incident.  Accordingly, the Court grants summary judgment to Physicians Group on Ms.

Jackson's IIED claim. [29]

V.       CONCLUSION

For the reasons discussed above, the Court denies summary judgment for the defense on

Ms. Jackson's race discrimination and retaliation claims, but grants Physicians Group summary

---

[28] Compare with Williams, 2007 U.S. Dist. LEXIS 65799 at *10 (denying motion to dismiss employee plaintiff's IIED claim against his employer, because plaintiff was not asserting a theory of vicarious liability but rather was seeking damages for specific independent actions and omissions of employer); Gillespie v. Vecenie, 436 A.2d 695, 697 (Pa. Super. 1981) (reversing the dismissal of an employee's claim against his employer stemming from a violent beating the employee had received by his co-employee, and holding that the employer could be liable in negligence for the attack because the victim alleged that the employer failed to provide him with a safe working environment, and knew or should have known that the attacker "had a vicious propensity of attacking fellow employees and had in fact been guilty of similar previous assaults upon other employees").

[29] See Andrews v. City of Phila., 895 F.2d 1469, 1487 (3d Cir. 1990) (affirming district court's entry of judgment n.o.v. for two individual supervisor defendants on plaintiff's IIED claim, and noting that just because the supervisors' acquiescence may have contributed to the general environment of the employer, it cannot be said that the supervisors personally encouraged, endorsed, or sponsored the incidents, and therefore they could not be held individually accountable); Pilla v. Delaware River Port Auth. No. 98-5723, 1999 U.S. Dist. LEXIS 6553, **23-24 (E.D. Pa. May 7, 1999) (denying supervisor defendants' motion to dismiss plaintiff's IIED claim because plaintiff pleaded that supervisor defendants had engaged in affirmative conduct to support such a claim, but also noting that an IIED claim "is not available against McCarthy and Tutak for failure to prevent and/or remedy a hostile work environment since there are no allegations that they personally encouraged, endorsed or sponsored every incident.").
The Court notes that Andrews and Pilla both address the liability of *individual supervisors*, not *corporate employers*, and therefore can be distinguished to some extent on their facts.  Nevertheless, the operative principle in these cases is the same, namely that a party cannot be held liable for another's conduct unless a lawful basis for liability can be established.

judgment as to Ms. Jackson's IIED claim.  An Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge